UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

   -v-                                 CASE NO:  5:18-CR-0410 (TJM)

MATTHEW LAGOE,

                   Defendant.

# SENTENCING MEMORANDUM OF DEFENDANT MATTHEW LAGOE

DATED: April 3, 2019                       Respectfully submitted,

                                              LISA A. PEEBLES
                                            Federal Public Defender

                   By:    Courtenay K. McKeon, Esq.
                            Assistant Federal Public Defender
                            Bar Roll No. 515841
                            Clinton Exchange, 3rd Floor
                            4 Clinton Square
                            Syracuse, New York   13202
                            (315) 701-0080

## I.   PRELIMINARY STATEMENT

On December 20, 2018, defendant Matthew Lagoe ("Mr. Lagoe") pled guilty, pursuant to a plea agreement, to one count of attempted possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C). (Dkt. No. 30.) Sentencing is scheduled for April 24, 2019. (Dkt. No. 31.)

The United States Probation Department prepared a Presentence Investigation Report (*hereinafter* "PSR") on March 5, 2019, in anticipation of sentencing. (Dkt. No. 32.) The PSR sets forth a total offense level of 21 and a Criminal History Category of II. *Id*. ¶¶ 23, 24-30.  The PSR states that the Guideline imprisonment range is 41 to 51 months. *Id*. ¶ 54.

Mr. Lagoe has reviewed the PSR and has no objection to the facts presented.

For the reasons discussed in Section II below, the defense objects to the PSR's calculation of the total offense level and the Guideline imprisonment range. The defense's position is that the total offense level is 10 and that the Guideline imprisonment range is 8-14 months.

Mr. Lagoe respectfully submits this memorandum in support of his request for a within-Guideline eight-month term of home detention or, in the alternative, intermittent confinement.

## II.   THE COURT SHOULD REJECT THE GUIDELINES' 1:500 RATIO FOR MDMA TO CONVERTED DRUG WEIGHT BECAUSE THE ANALYTICAL FRAMEWORK THE SENTENCING COMMISSION USED TO ESTABLISH THAT RATIO WAS FLAWED AT ITS INCEPTION AND HAS BEEN SCIENTIFICALLY DISCREDITED IN THE EIGHTEEN YEARS SINCE ITS IMPLEMENTATION.

The PSR assigns a base offense level of 24 (before acceptance) to Mr. Lagoe's conduct. (Dkt. No. 32 ¶ 14.) The PSR calculates that level using the Guidelines' 1:500 ratio for MDMA to converted drug weight. *Id*. That Guidelines ratio is analytically and scientifically flawed. The Court should reject the ratio, apply a ratio of 1:50, and find that Mr. Lagoe's base offense level is 14.

Generally, drug weight determines which base offense level is assigned to a controlled substance offense under the Guidelines. U.S.S.G. § 2D1.1(c). The Guidelines contain a Drug Quantity Table, which assigns base offense levels ranging from 6 to 38 for varying quantities of certain controlled substances that are explicitly listed by name in the table. *Id*. These explicitly listed controlled substances include, *inter alia*, heroin and cocaine. *Id*. Drugs that are not explicitly listed by name in the Drug Quantity Table must be translated into "converted drug weight" before a base offense level is assigned. *Id*.  The Guidelines provide a Drug Conversion Table for performing this calculation. U.S.S.G. § 2D1.1(d).

The controlled substance that Mr. Lagoe attempted to possess, MDMA, is not listed in the Drug Quantity Table. U.S.S.G. § 2D1.1(c). The Court must, therefore, consult the Drug Conversion Table. There, however, the Court must confront the fact that the Guidelines' assessment of MDMA was flawed at its inception and has been eroded even further by recent scientific research.

Before 2001, the Drug Conversion Table stated that one gram of MDMA was the equivalent of 35 grams of marijuana.[1] *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at * 2 (S.D.N.Y. Jan. 11, 2012).  In 2000, Congress passed the Ecstasy Anti-Proliferation Act, which directed the Sentencing Commission to increase the penalties for crimes involving MDMA. Pub. L. No. 106-310, 114 Stat. 1101, 1241-45; *Qayyem*, 2012 WL 92287, at * 2; *United States v. McCarthy*, No. 09 Cr. 1136 (WHP), 2011 WL 1991146, at * 1 (S.D.N.Y. May 19, 2011). In response, the Sentencing Commission increased the MDMA/marijuana ratio from 1:35 to 1:500. The Sentencing Commission explained its reasoning in *Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments* 6 (2001) ("Report to Congress").

---

[1] The term "converted drug weight" replaced "marijuana" for these purposes under the most recent amendments to the Guidelines.

The new 1:500 ratio reflected the Commission's opinion that MDMA is less dangerous

than heroin but more dangerous than powder cocaine. *Qayyem*, 2012 WL 92287, at *2. [2]  In its

Report,  the Commission relied on five factors to find that MDMA is less dangerous than heroin:

"(1) there are many more heroin cases in the federal system than MDMA cases; (2) heroin is

more addictive than MDMA; (3) heroin has many more emergency room visits and deaths

associated with its use than MDMA because, unlike MDMA which is generally taken orally,

heroin is injected; (4) heroin has more violence associated with both its users and distribution

system than MDMA, in part because MDMA users typically do not resort to violence to support

their drug use, and (5) heroin causes greater secondary health effects, such as the spread of HIV

and hepatitis, because it is injected." Report to Congress at 5.

Oddly, however, the Commission did not take into account those same factors when it

compared MDMA to powder cocaine. *Qayyem*, 2012 WL 92287, at *3. If the Commission's

analytical framework had been consistent, the conclusion that MDMA is less dangerous than

powder cocaine would have been inescapable. First, there are approximately twice as many

cocaine-related cases in the federal system than there are MDMA-related cases. *Qayyem*, 2012

WL 92287, at *3. Second, cocaine is more addictive than MDMA. *Qayyem*, 2012 WL 92287, at

*4 ("powder cocaine is approximately twice as likely to cause both physical and psychological

dependence as is MDMA"); *McCarthy*, 2011 WL 1991146, at * 3.[3] Indeed, MDMA is "one of

the least addictive drugs." *Id*. Third, the use of powder cocaine is far more likely to result in an

emergency room visit than the use of MDMA. *Qayyem*, 2012 WL 92287, at *3 (finding that

---

[2] The ratio for cocaine, if one were required, would be 1:200. *McCarthy*, 2011 WL 1991146, at * 4. The ratio for heroin would be 1:1000. *Qayyem*, 2012 WL 92287, at * 2.
[3] The *McCarthy* court relied on testimony from experts Andrew Parrot and Glen Hanson for this finding. Transcripts of both experts' testimony are included in comments from the Federal Defender Sentencing Guidelines Committee, attached as an exhibit to this sentencing memorandum. Dr. Parrot's testimony is on Bates-stamped pages 173-306. Dr. Hanson's testimony follows on pages 306-394.

cocaine is sixteen times more likely to lead to hospitalization than MDMA); *McCarthy*, 2011 WL 191146, at \*3 (same). Fourth, cocaine trafficking is associated with substantially more violence than MDMA trafficking. *Qayyem*, 2012 WL 92287, at \*3; *McCarthy*, 2011 WL 1991146, at \* 4. Fifth, "cocaine use causes several adverse health effects not implicated by MDMA use---such as cardiovascular effects, including disturbances in heart rhythm and heart attacks; respiratory effects, such as chest pain and respiratory failure; and neurological effects, including strokes and seizures." *McCarthy*, 2011 WL 1991146, at \* 3 (punctuation omitted).

Rather than applying consistent factors to its comparison of MDMA to heroin and its comparison of MDMA to powder cocaine, the Commission applied three different factors to conclude that MDMA should be punished more harshly than cocaine:  "(1) unlike MDMA, powder cocaine is not neurotoxic, (2) powder cocaine is not aggressively marketed to youth in the same manner as MDMA, and (3) powder cocaine is only a stimulant, but MDMA acts as both a stimulant and a hallucinogen." *Report to Congress* at 5. The Commission's assertions regarding neurotoxicity and the hallucinogenic properties of MDMA were dubious in 2001 and have been brought into even greater question since that time. *United States v. Holmes*, 2016 WL 1611579, at \*7 (D. Haw. Apr. 22, 2016); *United States v. Dafang*, No. 1:14-cr-00722-JMS (D. Haw. Feb. 2, 2015); *United States v. Thompson*, 2012 WL 1884661, at \*5 (S.D. Ill. May 23, 2012) ("considerable uncertainty exists as to the science and policies underlying the marijuana-to-MDMA ratio"); *Qayyem*, 2012 WL 92287, at \*4-5; *McCarthy*, 2011 WL 1991146, at \*2-3. The Commission's calculation of a 1:500 ratio for MDMA to marijuana was, accordingly, flawed both analytically and scientifically.

As the preceding discussion shows, there is little or no empirical basis for the Sentencing Commission's finding that MDMA is a more dangerous drug than powder cocaine. The Commission's own analytical framework and later scientific studies demonstrate that MDMA is

substantially less dangerous than powder cocaine. Accordingly, this Court should exercise its discretion to reject the 1:500 ratio. *Qayyem*, 2012 WL 92287, at * 1 (A district court that disagrees with a Guidelines ratio may replace the ratio with one that, "in its judgment, corrects the disparity.") (quoting *Spears v. United States*, 555 U.S. 261, 265 (2009)). The defense submits that a ratio of 1:50---a ratio higher than the 1:35 MDMA/marijuana ratio that Congress rejected in 2000 but lower than the 1:100 ratio for powder cocaine---would be appropriate.

The plea agreement between the parties states that Mr. Lagoe attempted to possess with intent to distribute 989 tablets of MDMA and that the "total weight of MDMA attributable to the defendant for sentencing purposes [is] 247.25 grams." (Dkt. No. 30 ¶ 6(a)-(b).) Applying a 1:50 ratio, Mr. Lagoe is responsible for 12.36 kilograms in converted drug weight. The base offense level applicable to that drug weight is 14. The defense therefore respectfully requests that the Court find that Mr. Lagoe's base offense level is 14.

### III.    BECAUSE MR. LAGOE QUALIFIES FOR THE SAFETY VALVE AND HAS ACCEPTED RESPONSIBILITY FOR HIS ACTIONS, THE COURT SHOULD FIND THAT MR. LAGOE'S TOTAL OFFENSE LEVEL IS 10.

As discussed above, it is the defense's position that Mr. Lagoe's base offense level is 14. That offense level should be reduced a further four points because Mr. Lagoe constructively qualifies for the safety valve and has accepted responsibility for his actions. Both the PSR and the government's sentencing memo agree that Mr. Lagoe should receive a two-level reduction in his offense level under the safety valve provisions of Guidelines §§ 2D1.1(b)(18) and 5C1.2. (Dkt. No. 32 ¶ 70 ; Dkt. No. 33 at 2.)  The PSR and the government's sentencing memo also agree that Mr. Lagoe is entitled to a further reduction for his prompt acceptance of responsibility. (Dkt. No. 32 ¶¶21-22; Dkt. No. 33 at 2.)  If the Court finds that Mr. Lagoe's base offense level is 16 or greater, he is entitled to a three-point reduction pursuant to Guideline 3E1.1. If the Court finds that Mr. Lagoe's base offense level is under 16, he is entitled to a two-point reduction for

acceptance of responsibility. *Id*. The defense contends that these reductions should result in a

total offense level of 10.

The Guideline sentence for an offender in Criminal History Category II with a total

offense level of 10 is 8-14 months. This falls in Zone B of the Sentencing Table. In Zone B, the

purposes of sentencing can be satisfied by "a sentence of probation that includes a condition or

combination of conditions that substitute intermittent confinement, community confinement, or

home detention for imprisonment." U.S.S.G. § 5C1.1. A sentence of home detention or

intermittent confinement is thus appropriate in this case.

**IV.     THE 18 U.S.C. § 3553(a) FACTORS[4] WEIGH IN FAVOR OF A GUIDELINE
         SENTENCE OF EIGHT MONTHS OF HOME DETENTION OR, IN THE
         ALTERNATIVE, INTERMITTENT CONFINEMENT.**

**A.      A Sentence of Eight Months of Home Detention or, in the Alternative,
         Intermittent Confinement, Would Adequately Reflect Mr. Lagoe's History
         and Characteristics.**

A Guideline sentence of eight months of home detention or, in the alternative,

intermittent confinement, would adequately reflect Mr. Lagoe's history and characteristics. Mr.

Lagoe is a hard-working man with a steady job who is valued by his employer. He has worked

full-time for Fradon Lock Company since 2015. (Dkt. No. 32 ¶ 44.) As the letter of support (filed

separately) from his employer, Hope Tucker, indicates, he is a valued member of the

organization. As a full-time worker, Mr. Lagoe is contributing tax dollars to the economy rather

---

[4] After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the sentencing Guidelines are advisory rather than mandatory.  Therefore, in determining a sentence, a court must equally consider the Guideline calculations, the unique characteristics of the defendant, and the other statutory concerns listed in 18 U.S.C. § 3553(a), specifically: (1) The nature and circumstances of the offense and the history and characteristics of the defendant; and (2) The need for the sentence imposed to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a).

than draining taxpayers of the $36,300.00 it costs to house an inmate in a Bureau of Prisons facility for one year. (Dkt. No. 32 ¶ 64.) Courts may appropriately consider stable employment as a reason for imposing a lenient sentence. *United States v. Munoz-Nova*, 524 F.3d 1137 (10th Cir. 2008).

Further, Mr. Lagoe has, in the past three months, begun actively participating in substance abuse counseling. He attends group sessions at Crouse three times a week, individual treatment once a month, and weekly meetings at SMART Recovery. He and his counselor at Crouse have discussed the possibility of inpatient treatment but have concluded that continuing Mr. Lagoe's current treatment schedule is the appropriate course for now. A sentence of home detention or intermittent incarceration would allow him to continue his treatment without interruption. Accordingly, this factor weighs in favor of a Guideline sentence of home detention or, in the alternative, intermittent confinement.

> **B.      A Sentence of Eight Months of Home Detention or, in the Alternative, Intermittent Confinement, Would Adequately Reflect the Seriousness of the Offense.**

A Guideline sentence of eight months of home detention or, in the alternative, intermittent detention, would adequately reflect the seriousness of Mr. Lagoe's offense.  As Mr. Lagoe advised the government during his safety valve proffer, he ordered the MDMA online from a seller in Germany, intending to distribute it at parties attended by people his age. Although the intended distribution of any illegal controlled substance is serious, Mr. Lagoe's actions lack many of the aspects that make drug crimes dangerous. Mr. Lagoe never engaged in any violence. (Dkt. No. 32 ¶¶ 4-8.) There is no indication that Mr. Lagoe marketed MDMA to minors. Mr. Lagoe was not part of a network of drug dealers vying for control over a market. Mr. Lagoe did not traffic in substances such as fentanyl or heroin, which lead routinely to tragic effects on users. As discussed above, MDMA is a relatively non-addictive drug with a low

potential for causing health risks in comparison with other controlled substances. Finally, Mr.

Lagoe never even received the MDMA that he ordered, as it was seized by law enforcement and

replaced with a sham substance before he took possession of the package. (Dkt. No. 32 ¶ 6.)

Accordingly, this factor weighs in favor of a Guideline sentence of home detention or, in the

alternative, intermittent confinement.

> **C.     A Sentence of Eight Months of Home Detention or, in the Alternative, Intermittent Confinement, Would Adequately Promote Respect for the Law, Provide Just Punishment, and Deter Criminal Conduct.**

A Guideline sentence of eight months of home detention or, in the alternative,

intermittent confinement, would sufficiently promote respect for the law, provide just

punishment, and deter criminal conduct by others. Studies of the deterrent effect of prison

sentences have found that it is the prosecution of crime, rather than the sentence imposed, that

has the strongest deterrent effect. In one of the best studies of specific deterrence, which

involved federal white collar offenders in the pre-guideline era, no difference in deterrence was

found between probation and imprisonment. Another study by the Institute of Criminology at

Cambridge University examined the effects of changes to both the *certainty* and the *severity* of

punishment. While significant correlations were found between the certainty of punishment and

crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to

achieve statistical significance." *See* David Weisburd et. al., *Specific Deterrence in a Sample of

Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). Accordingly, these

factors weigh in favor of the Court imposing a Guideline sentence of eight months of home

detention or, in the alternative, intermittent confinement.

## III.    CONCLUSION

For the reasons discussed above, the defense respectfully requests that the Court impose a

Guideline sentence of eight months of home detention or, in the alternative, intermittent

confinement.


DATED: April 3, 2019                                    LISA A. PEEBLES
                                                        FEDERAL PUBLIC DEFENDER
                                            By:    */s/ Courtenay K. McKeon, Esq.*
                                                        Assistant Federal Public Defender
                                                        Bar Roll No. 515841
                                                        Clinton Exchange, 3rd Floor
                                                        4 Clinton Street
                                                        Syracuse, New York   13202
                                                        (315) 701-0080



To:    Michael Gadarian, AUSA (via ECF)
       Courtney A. Tafel (via email)
       Matthew Lagoe (via email)

9